PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. McNAMARA, | ) | |
| | ) | CASE NO.  4:15CV0600 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| GENERAL MOTORS, LLC, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | [Resolving ECF Nos. 26 and 27] |

Plaintiff Michael J. McNamara, a current employee of Defendant General Motors LLC

("GM"), brought this action against GM alleging claims of disability discrimination, harassment,

and retaliation pursuant to Ohio Rev. Code Ch. 4112.  These claims are now before the Court

upon cross-motions for summary judgment (ECF Nos. 26 and 27).  The Court has been advised,

having reviewed the record, the parties' briefs,[1] and the applicable law.  For the reasons set forth

below, Plaintiff's motion is denied and Defendant's motion is granted.

**I.  Stipulated Facts**

The stipulated facts[2] are as follows:

1.  Plaintiff began working for GM on or about October 30, 2006.

---

[1]  Plaintiff did not file a Reply Memorandum in support of his Motion for
Summary Judgment (ECF No. 26).  *See* Local Rule 7.1(e).

[2]  *See* Joint Statement of Undisputed Facts (ECF No. 28).

(4:15CV0600)

2.  In May 2010, Plaintiff transferred to GM's assembly plant in Lordstown, Ohio, where he continues to work.[3]

3.  As an hourly employee, Plaintiff is a member of the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and the terms of his employment are governed in part by the collectively-bargained GM-UAW National Agreement.

4.  The parties stipulate to the foundation and authenticity of the following documents for purposes of summary judgment:

a.  All U.S. laws inclusive of the Americans with Disabilities Act ("ADA") and implementing regulations;

b.  Plaintiff's medical records, including Plaintiff's GM Medgate records and records of Plaintiff's treating physicians produced in this case by Plaintiff and GM;

c.  2011 GM-UAW National Agreement; and,

d.  Plaintiff's personnel records, as issued to Plaintiff.

## II.  Background

Plaintiff began working for GM as an hourly production employee in Shreveport, Louisiana.  Deposition of Plaintiff (ECF No. 27-2) at PageID # 301, Pages 17-18.  In May 2010, Plaintiff transferred to GM's assembly plant in Lordstown, Ohio.  ECF No. 27-2 at PageID #: 301, Pages 18-19.  In or around July 2014, Plaintiff was diagnosed with Generalized Anxiety

---

[3]  At the Telephonic Status Conference conducted on February 3, 2016, the Court was informed that Plaintiff had accepted a transfer to another GM plant in Spring Hill, Tennessee.  *See* Plaintiff's Motion for Telephonic Status Conference (ECF No. 29).

(4:15CV0600)

Disorder.  ECF No. 27-2 at PageID #: 338, Pages 166-67; Letter dated October 22, 2014 from Plaintiff's counsel (ECF No. 27-2 at PageID #: 368).

The GM-UAW National Agreement contains a progressive disciplinary procedure for violations of plant shop rules.  Disciplinary action ranges from reprimand to discharge, depending on the severity of the conduct and the offending employee's prior disciplinary action. The National Agreement also includes a separate disciplinary procedure for violation of the attendance policy, which is known as "Document 8."  ECF No. 27-2 at PageID #: 304, Pages 30-31.

GM prohibits discrimination in the workplace, including on the basis of disability and other legally protected statuses.  ECF No. 27-2 at PageID #: 303, Pages 25-26; Pages from the GM-UAW National Agreement (ECF No. 27-2 at PageID #: 353-61).  GM's policies also prohibit retaliation for engaging in protected activity.  ECF No. 27-2 at PageID #: 353-61.  GM takes a strong stance against harassment in the workplace, and Plaintiff is aware of the multiple ways in which he can report harassment to GM management under the company's policy.  ECF No. 27-2 at PageID #: 303-304, Pages 28-29; ECF No. 27-2 at PageID #: 353-61.

### A.      Plaintiff's first week at the Lordstown plant

On May 28, 2010, Plaintiff was issued a disciplinary notice for violation of the shop rule prohibiting misconduct.  As a result, Plaintiff was suspended for the balance of his shift plus one day.  ECF No. 27-2 at PageID #: 308, Page 48; Notice of Disciplinary Suspension, Layoff or Discharge (ECF No. 27-2 at PageID #: 362).  Plaintiff claims he had been certified in his newly assigned role by a team leader who told Plaintiff that Plaintiff had been doing a good job.  ECF

3

(4:15CV0600)

No. 27-2 at PageID #: 306, Page 40.  Shortly thereafter, a supervisor advised Plaintiff that he was

not following the standardized process for the job and he needed to assemble his assigned part in

a different manner.  ECF No. 27-2 at PageID #: 307, Page 41.  Another supervisor told Plaintiff

he was damaging the vehicle, and Plaintiff yelled, "[A]re you people crazy?"  ECF No. 27-2 at

PageID #: 307, Page 42.  The supervisor instructed Plaintiff to go to the team center at Cobalt

Hall, and Plaintiff responded, "F [C]obalt [H]all.  I'm going to the Union hall."  ECF No. 27-2 at

PageID #: 307, Page 42; Declaration of Labor Relations Manager Daniel Risner (ECF No. 27-3)

at PageID #: 370, ¶ 3; Statements from Business Manager Katrina Oliver and Supervisor James

Rigas (ECF No. 27-3 at PageID #: 373-75).

　　　　While sitting in Cobalt Hall, another supervisor told Plaintiff that more than 10 other

hourly employees reported to management that they felt threatened by him.  ECF No. 27-2 at

PageID #: 307, Page 44.  Indeed, several team members submitted written statements

complaining of Plaintiff's obscene language and temper.  ECF No. 27-3 at PageID #: 370, ¶ 2;

Statements from coworkers (ECF No. 27-3 at PageID #: 376-77).  Plaintiff believes the team

members complained about him because he is a loud talker and because he is from out-of-state.

ECF No. 27-2 at PageID #: 307, Page 43; PageID #: 309, Page 50.  Plaintiff admits he was

stressed out from his recent move to Ohio and frustrated because he was struggling to keep up

with the job he was assigned.  ECF No. 27-2 at PageID #: 307, Page 41-42.

　　　**B.　　Plaintiff's confrontation with a coworker**

　　　　In or around November 2010, two of Plaintiff's coworkers were shooting rubber bands at

one another.  ECF No. 27-2 at PageID #: 310, Page 56; PageID #: 312, Pages 62-63.  When one

(4:15CV0600)

of the rubber bands flew by Plaintiff, he told the employees to stop shooting the bands.  ECF No. 27-2 at PageID #: 310, Page 56.  Plaintiff claims one of the employees, a fork truck driver, told him, "I will kick your ass," and Plaintiff responded that he would come over and kill him.  ECF No. 27-2 at PageID #: 310-11, Pages 56-57.  Following the altercation, Plaintiff and the fork truck driver met separately with union and management representatives.  ECF No. 27-2 at PageID #: 311, Page 57; PageID #: 313, Page 65.  Although Plaintiff admitted to making the statement, and the witness statements collected by management corroborated the fact that he had threatened the fork truck driver, Plaintiff was not disciplined.  ECF No. 27-2 at PageID #: 311, Page 57; PageID #: 313, Page 65; ECF No. 27-3 at PageID #: 370-71, ¶ 5; Statements from the fork truck driver and witnesses to the incident (ECF No. 27-3 at PageID #: 378-81).

Plaintiff admits his coworkers stopped shooting rubber bands in his area, but claims he would find rubber bands around his work station and locker.  ECF No. 27-2 at PageID #: 311, Pages 59-60; PageID #: 313, Pages 65-66.  He also claims the same fork truck driver would incorrectly load parts in Plaintiff's area and refused to cut his boxes open, which aggravated Plaintiff because he had to dig deep into the box to grab the last part.  ECF No. 27-2 at PageID #: 311, Page 60; PageID #: 320, Page 93.  Plaintiff concedes it was not part of the standardized work process for the fork truck driver to open his boxes, but believes it was a "common courtesy."  ECF No. 27-2 at PageID #: 320, Page 94.  The fork truck driver was ultimately moved to another department.  ECF No. 27-2 at PageID #: 321, Page 99.

5

(4:15CV0600)

### C.    Plaintiff's confrontation with a team leader and subsequent leave of absence

On or about January 13, 2011, Plaintiff asked a team leader to empty the garbage in a coworker's area, and the team leader responded that it was not his job. ECF No. 27-2 at PageID #: 313, Pages 66-67.  Plaintiff became angry and said, "[W]hat is your [ ] F'ing job; to do nothing for $30 an hour?" ECF No. 27-2 at PageID #: 313, Pages 67-68.  That day, Plaintiff met with union representatives and Labor Relations Representative John Brincko, at which time he was suspended the balance of shift plus two weeks for his "ongoing disruptive [and] boisterous actions, behavior and language." ECF No. 27-2 at PageID #: 314, Pages 69-72; Notice of Disciplinary Suspension, Layoff or Discharge (ECF No. 27-2 at PageID #: 363).[4]  At the time he was disciplined, Plaintiff was directed to make an appointment with the Medical Director at the Lordstown medical department before returning to work. ECF No. 27-2 at PageID #: 363.

Plaintiff reported to the plant medical department on January 26, 2011 and was examined by the former Medical Director, Dr. Maryann Olynk.  GM Medgate records (ECF No. 27-4) at PageID #: 396-97; ECF No. 27-2 at PageID #: 315-16, Pages 76-78.  Dr. Olynk documented that Plaintiff reported he had been to the emergency room twice in the past week due to psychological distress, and had an appointment with a psychiatrist scheduled in the coming weeks.  Dr. Olynk further observed Plaintiff to be in an agitated state.  Due to her objective belief that Plaintiff could not avoid getting into conflict with his coworkers or supervisors at that time, Dr. Olynk

---

[4]  Plaintiff himself certified his need for sick leave beginning on January 13, 2011 in the Statement of Claim for Sickness and Accident Benefits form he signed.  *See* Statement of Claim for Sickness and Accident Benefits (ECF No. 26 at PageID #: 246).

(4:15CV0600)

concluded that Plaintiff should not be allowed to return to work until he could be evaluated by a psychiatrist.  ECF No. 27-4 at PageID #: 397.

Dr. Olynk also noted in Plaintiff's medical file that a nurse in plant medical reported that on the night Plaintiff was suspended, he made a statement that he understood and sympathized with people who bring guns to work, and he referenced a recent incident in Arizona in which numerous people were shot, including a U.S. Congresswoman.  Plaintiff further remarked that the security at GM's Lordstown plant was a joke.  ECF No. 27-4 at PageID #: 400.  In addition, Dr. Olynk chronicled a February 25, 2011 telephone conversation with Dr. Warren Rogers, Plaintiff's psychiatrist, in which Dr. Rogers stated that Plaintiff, whom he believed suffered from bipolar disorder mixed with possible psychotic symptoms, threatened him and his staff.  ECF No. 27-4 at PageID #: 400; *see also* ECF No. 27-2 at PageID #: 316-17, Pages 79-82.  Based on his assessment, Dr. Rogers did not immediately clear Plaintiff to return to work.  ECF No. 27-4 at PageID #: 400.  While on leave, Plaintiff earned a portion of his wages and maintained his health insurance and other benefits.  ECF No. 27-2 at PageID #: 318-19, Pages 88-89.

In early September 2011, Dr. Rogers released Plaintiff to return to work on the condition that he take his prescribed medication.  ECF No. 27-4 at PageID #: 401; ECF No. 27-2 at PageID #: 317, Page 84.[5]  All employees returning from a medical leave of absence must be cleared by the plant medical department before returning to work.  ECF No. 27-2 at PageID #: 315, Pages 73-74.  Due to the specialized nature of Plaintiff's condition, he met with the Lordstown Medical

---

[5]  Plaintiff testified that, with the exception of the Xanax, he threw all his medications prescribed by Dr. Rogers in the garbage, and "went along [with him] to get back to work."  ECF No. 27-2 at PageID #: 317, Page 84.

(4:15CV0600)

Director, Dr. Christopher Kiczek, and GM's retained psychiatrist, Dr. Donald Jones, who

participated by telephone.  During the appointment, Dr. Jones determined that Plaintiff's newly

prescribed medication had been prescribed in a sub-therapeutic dosage.  ECF No. 27-4 at PageID

#: 401; ECF No. 27-2 at PageID #: 318, Pages 85-86.  This concern was discussed with Plaintiff,

who then returned to Dr. Rogers for consideration of a dosage adjustment prior to returning to

work. ECF No. 27-4 at PageID #: 401; ECF No. 27-2 at PageID #: 318, Page 86.  Dr. Rogers

adjusted Plaintiff's prescription to a therapeutic dosage,[6] and following a monitoring period of

approximately two weeks, Plaintiff was cleared to return to work on October 25, 2011.  ECF No.

27-4 at PageID #: 401-402; ECF No. 27-2 at PageID #: 318, Pages 86-87.

> ### D.    GM receives notice of an Occupational Safety and Health Administration ("OSHA") complaint regarding Plaintiff's threatening behavior

In early June 2012, Lordstown management received an OSHA complaint that included

allegations that Plaintiff threatened to shoot UAW Shop Chairman Danny Morgan and that police

were called to remove Plaintiff from the union hall.  ECF No. 27-2 at PageID #: 334, Page 152;

Page ID #: 344, Page 191; ECF No. 27-3 at PageID #: 371, ¶ 6.  Labor Relations Manager Daniel

Risner interviewed Plaintiff and obtained documentation from local union officials who

witnessed the incident.  ECF No. 27-2 at PageID #: 334, Page 151-52; ECF No. 27-3 at PageID

#: 371, ¶ 6; Notes From Interview (ECF No. 27-3 at PageID #: 382-84); Statements (ECF No.

27-3 at PageID #: 385-86).  Plaintiff denied making any such threat toward Morgan, and he was

not disciplined.  ECF No. 27-2 at PageID #: 335, Pages 154-56.

---

[6] Plaintiff's prescription was only adjusted from 5 mg to 10 mg.  ECF No. 27-4 at PageID #: 401.

(4:15CV0600)

### E.    Plaintiff is disciplined for threatening two GM managers

On September 21, 2012, Plaintiff was suspended for the balance of his shift plus three days for threatening and intimidating Supervisor Corry Scott and Business Manager Kimberly Johnson.  Notice of Disciplinary Suspension, Layoff or Discharge (ECF No. 27-2 at PageID #: 364).  Plaintiff claims he pulled a cord to stop the assembly line because another employee kept moving into his work area in an attempt to keep up with the line.  ECF No. 27-2 at PageID #: 326-27, Pages 120-22.  The supervisor reported that he asked Plaintiff about stopping the line, at which time Plaintiff yelled and pointed his finger in the supervisor's face, coming so close that Plaintiff ended up spitting on him.  ECF No. 27-3 at PageID #: 371, ¶ 7; Statements of Supervisor and Business Manager (ECF No. 27-3 at PageID #: 387-88).  The business manager and another member of management witnessed the incident.  The business manager also reported Plaintiff yelled at her.  ECF No. 27-3 at PageID #: 388.  While Plaintiff admits he was talking loudly, he denies threatening the managers.  ECF No. 27-2 at PageID #: 328, Pages 125 and 127.  Some of Plaintiff's team members again submitted written complaints to management regarding Plaintiff's intimidating behavior and obscene language.  ECF No. 27-3 at PageID #: 371, ¶ 8; Statements from coworkers (ECF No. 27-3 at PageID #: 389-90).

### F.    Plaintiff is disciplined under the attendance policy

On June 20, 2014, Plaintiff requested a medical pass from a supervisor because he was upset that his coworkers were shooting rubber bands near him.  ECF No. 27-2 at PageID #: 329, Pages 130-32.  Plaintiff also complained to Supervisor Craig Houser that the team leaders in his area were not performing their jobs and the trash in his area was not being emptied.  ECF No. 27-

9

(4:15CV0600)

3 at PageID #: 371, ¶ 9; Statement of Supervisor (ECF No. 27-3 at PageID #: 391-92).  While

Plaintiff was in the plant medical department, a nurse overheard him tell a union committeeman

that years ago he hit another man so hard during a physical confrontation that "[the man's]

eyeball fell out of his head."  ECF No. 27-2 at PageID #: 330, Page 133.  That same day, Plaintiff

told Dr. Kiczek "[t]here could be a confrontation" if he gets hit with a rubber band.  ECF No. 27-

2 at PageID #: 330, Page 134.  Plaintiff claims his committeeman then suggested he leave the

plant and visit his psychiatrist.  ECF No. 27-2 at PageID #: 330, Page 135-36.  Plaintiff remained

off work from June 21, 2014 through July 21, 2014 and applied for disability leave.  ECF No. 27-

2 at PageID #: 330-31, Pages 136-37.

Shortly after Plaintiff's return to work, GM's third-party leave administrator notified

Labor Relations at Lordstown that Plaintiff was denied coverage, and thus not on an approved

leave of absence for the time he was off work.  ECF No. 27-3 at PageID #: 371, ¶ 10; ECF No.

27-3 at PageID #: 393-94.  Plaintiff claims his physician's office mishandled the paperwork

certifying his leave and admits he did not have coverage for his time off work.  ECF No. 27-2 at

PageID #: 330-32, Pages 136-42 and 144; PageID #: 333, Page 146.  Plaintiff was notified in a

letter dated July 23, 2014 that his claim for disability leave benefits had been denied because the

paperwork provided to GM's leave administrator revealed that Plaintiff had not been treated

during his absence, and the physician who treated Plaintiff during the claim period did not certify

him for the leave.  ECF No. 27-2 at PageID #: 336, Pages 159-60; Letter from GM Benefits &

Services Center (ECF No. 27-2 at PageID #: 366-67).  Plaintiff was further notified of his appeal

rights, which he admittedly did not pursue.  ECF No. 27-2 at PageID #: 336, Page 160; ECF No.

10

(4:15CV0600)

27-2 at PageID #: 366-67.  After giving Plaintiff time to get the situation corrected, management

issued Plaintiff a disciplinary suspension of the balance of his shift plus one week beginning on

September 18, 2014 as a result of his unexcused absences.  Notice of Disciplinary Suspension,

Layoff or Discharge (ECF No. 27-2 at PageID #: 365).

### G.    Plaintiff's team member reports a threat made by Plaintiff

In approximately October 2014, an hourly employee reported that Plaintiff made a

threatening statement to her about his ability to construct explosives.  She further complained

about Plaintiff's abusive language toward other employees.  ECF No. 27-3 at PageID #: 372, ¶

11.  Labor Relations interviewed Plaintiff about the report, which Plaintiff denied.  ECF No. 27-2

at PageID #: 334, Pages 150-51; PageID #: 335-36, Pages 156-57; Email message from Labor

Relations Manager Daniel Risner dated October 6, 2014 (ECF No. 27-3 at PageID #: 395-96).

Plaintiff was not disciplined.  ECF No. 27-2 at PageID #: 334, Pages 150-51.  He believes the

team member made the complaint because he reported her and other employees for playing the

radio and dimming the lights on the plant floor, and as a result of bias because he transferred to

the plant from another state.  ECF No. 27-2 at PageID #: 333-34, Pages 147-50; *see also* ECF

No. 27-2 at PageID #: 333, Page 147 ("They can't stand me because I'm not a local.").

### H.    Plaintiff is disciplined under the shop rules for failure to perform his job

On February 14, 2015, Plaintiff was suspended for the balance of his shift plus one day

for failing to install engine covers.  Notice of Disciplinary Suspension, Layoff or Discharge (ECF

No. 27-2 at PageID #: 369).  Plaintiff testified he was warned the day before for the missing

parts, and he was disciplined the following day when additional engines were sent down the line

11

(4:15CV0600)

without the covers he was responsible for installing.  ECF No. 27-2 at PageID #: 340, Pages 173-74.  Plaintiff claims he marked the engines and covers he installed and that other team members sabotaged him by removing and hiding the engine covers.  ECF No. 27-2 at PageID #: 339-41, Pages 172-78.  Although Plaintiff could not identify any facts to support his accusations and admits he missed an engine cover from time to time, Plaintiff believes a "clique" of three hourly employees who walked by his work area daily were responsible for hiding the engine covers. ECF No. 27-2 at PageID #: 341, Pages 178-80. Plaintiff contends he found the missing engine covers following his one-day suspension.  ECF No. 27-2 at PageID #: 340-41, Pages 176-77. When asked about why he believes the employees would hide the parts, Plaintiff stated they want to get him fired because he is "an out-of-stater . . . not a local."  Plaintiff went on to further explain that, "[a] local is living here all your life and you get a job here at this plant.  When you come from another plant, you're an outcast.  They don't like you. . . . They don't want you here." ECF No. 27-2 at PageID #: 342-43, Pages 184-85.

I.     **Plaintiff's production classification and rate of pay**

Before working for GM, Plaintiff worked for Delphi in Fitzgerald, Georgia.  ECF No. 27-2 at PageID #: 300, Pages 15-16.  He was hired by Delphi in May 2005 as a machine repairman, a skilled-trades position under Delphi's contract with the UAW.  ECF No. 27-2 at PageID #: 301, Page 17; PageID #: 322, Pages 102-103.  As part of an agreement between GM and the UAW, Plaintiff transferred to GM's assembly plant in Shreveport in a production/assembler role.  ECF No. 27-2 at PageID #: 301, Pages 17-18.  As of the time Plaintiff accepted a transfer to another

12

(4:15CV0600)

GM plant in Spring Hill, Tennessee, Plaintiff had never worked in a skilled-trades position for

GM.  ECF No. 27-2 at PageID #: 324, Page 109.

Plaintiff believes, despite his production classification, he should have been receiving a

skilled-trades rate of pay since his transfer to Shreveport, and that he also should have been

transferred to a skilled-trades opening, pursuant to the terms of the National Agreement.  ECF

No. 27-2 at PageID #: 324, Pages 110-11; PageID #: 349, Page 211.  Plaintiff contends Labor

Relations Manager Daniel Risner offered him a skilled-trades position at GM's plant in Parma,

Ohio in 2011, which Plaintiff rejected.  ECF No. 27-2 at PageID #: 322, Page 104; PageID #:

324-25, Pages 111-13.[7]  Plaintiff also claims a representative of the international union advised

him he is classified as skilled-trades with GM, while local union officials have told him he is not.

ECF No. 27-2 at PageID #: 322, Pages 103-104; PageID #: 323, Pages 105-107; PageID #: 326,

Pages 117-18.  Plaintiff believes he has been denied skilled-trades opportunities because of his

dispute with UAW Shop Chairman Danny Morgan.  ECF No. 27-2 at PageID #: 323, Page 108.

Plaintiff has never initiated a grievance regarding his production classification or rate of pay.

ECF No. 27-2 at PageID #: 325, Pages 115-16.

_____

[7]  Risner denies offering Plaintiff a skilled-trades job in Parma.  Deposition of
Daniel Risner (ECF No. 27-5) at PageID #: 414, Page 46.  Risner met with Plaintiff and
the UAW skilled-trades zoneman after Plaintiff applied to be placed in a skilled-trades
position through a 2011 special attrition program.  Risner advised Plaintiff at that time he
was not eligible to be placed through the program because he did not have a GM
skilled-trades entry date.  ECF No. 27-5 at PageID #: 414, Pages 46-47.  Plaintiff,
however, does not recall any such discussion with Risner or the union.  ECF No. 27-2 at
PageID #: 325, Page 115.

(4:15CV0600)

###### J.    Plaintiff's claims of disability discrimination, harassment, and retaliation

Plaintiff claims other team members refer to him as "Crazy Mike."  ECF No. 27-2 at PageID #: 305, Page 35; PageID #: 344, Pages 189-90.  According to Plaintiff, the nickname started at the Shreveport plant when he protested the closure of the plant and had multiple guns drawn on him by the police.  ECF No. 27-2 at PageID #: 321-22, Pages 100-101; PageID #: 344, Pages 189-90.  Plaintiff also claims that UAW Shop Chairman Morgan once told him to "take a pill."  ECF No. 27-2 at PageID #: 344-45, Pages 191-94.  Plaintiff reported to his union committeemen that he felt he was being discriminated against because of his anxiety condition in that others interpreted his emotions and loud voice as threatening conduct.  ECF No. 27-2 at PageID #: 343, Pages 186-88.  Plaintiff never made any such complaint to GM management.  ECF No. 27-2 at PageID #: 343, Page 188.

Plaintiff claims John Bukavino retaliated against him on one occasion by watching him work for nearly three hours and stating, "I'm watching you, Mike."  At the time, Bukavino was a Business Manager in the Chassis department where Plaintiff worked.  ECF No. 27-2 at PageID #: 346, Page 200.  Plaintiff also believes the hourly employees who purportedly hid his engine covers and cranked up radios near his work station retaliated against him.  ECF No. 27-2 at PageID #: 346, Page 199; PageID #: 347, Pages 201-202.  He claims their alleged conduct was in retaliation for his complaints to management about them shooting rubber bands on the plant floor.  ECF No. 27-2 at PageID #: 347, Page 204.

In February 2015, Plaintiff filed a Complaint (ECF No. 1-1 at PageID #: 7-9) against GM in the Trumbull County, Ohio Court of Common Pleas, being Case No. 2015 CV 00370.

14

(4:15CV0600)

Defendants removed the case to this Court on March 26, 2015, on the basis of diversity

jurisdiction.  *See* Defendants' Notice of Removal (ECF No. 1 at PageID #: 2, ¶ 4).[8]

### III.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required

to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the

pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has

failed to establish an essential element of his case upon which he would bear the ultimate burden

of proof at trial."  *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely

on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be

---

[8]  The Complaint (ECF No. 1-1 at PageID #: 7-9) references both the ADA and
Ohio Rev. Code Ch. 4112.  However, it is undisputed that Plaintiff never filed an
administrative charge of discrimination regarding his disability discrimination claims.
Therefore, to the extent Plaintiff is attempting to recover under the ADA, any such claim
is subject to dismissal as he has not exhausted his administrative remedies.  "The
exhaustion of administrative remedies is a condition precedent to an ADA action."
*Hoover v. Timken Co.*, 30 Fed. Appx. 511, 513 (6th Cir. 2002).  The failure to timely
exhaust administrative remedies is an appropriate basis for dismissal of an ADA action.
*Id.*

(4:15CV0600)

resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The

non-moving party must, to defeat the motion, "show that there is doubt as to [whether] the

material facts and that the record, taken as a whole, does not lead to a judgment for the movant."

*Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the

evidence in the light most favorable to the non-moving party when deciding whether a genuine

issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242 (1986), stated that in order for a motion for summary judgment to be granted, there must be

no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution

will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the

court must decide whether the evidence is such that reasonable jurors could find that the

non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand

summary judgment, the non-movant must show sufficient evidence to create a genuine issue of

material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a

mere scintilla of evidence in support of the non-moving party's position ordinarily will not be

sufficient to defeat a motion for summary judgment. *Id.* This standard of review does not differ

16

(4:15CV0600)

when reviewing cross-motions for summary judgment versus a motion filed by only one party.

*U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

## IV. Analysis

### A. Disability Discrimination Claim

#### 1. Plaintiff cannot establish that his disciplinary suspensions amounted to unlawful discrimination on the basis of his disability.

To establish a *prima facie* case of disability discrimination under Ohio Rev. Code § 4112.02, a plaintiff must show that: "(1) the employee was disabled, (2) that the employer took adverse employment action against the employee, which was caused, at least in part, by the employee's disability; and that (3) despite the disability, the employee can safely and substantially perform the essential functions of the job, with or without a reasonable accommodation." *Sheridan v. Jackson Twp. Div. Fire*, No. 08AP-771, 2009 WL 714081, at *1, ¶ 5 (Ohio App. 10th Dist. March 19, 2009) (citing *Columbus Civil Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571 (1998), and *Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 302 (1996)).[9]

In *Hood*, the Supreme Court of Ohio stated:

> Once the plaintiff establishes a prima facie case of handicap discrimination, the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197, 20 O.O.3d 200, 203, 421 N.E.2d 128, 132. Legitimate, nondiscriminatory reasons for the action taken by the employer may include, but are not limited to, . . . the inability

---

[9] In deciding cases under § 4112.02, the Ohio Supreme Court has recommended that courts look to the ADA for guidance on the interpretation of Ohio's prohibition on disability discrimination. *See McGlone*, 82 Ohio St.3d at 573.

(4:15CV0600)

> of the employee or prospective employee to safely and substantially perform, with reasonable accommodations, the essential functions of the job in question.  *See, e.g.*, Ohio Adm.Code 4112-5-08(D)(4) and (E).  Finally, if the employer establishes a nondiscriminatory reason for the action taken, then the employee . . . must demonstrate that the employer's stated reason was a pretext for impermissible discrimination.  *Plumbers & Steamfitters Joint Apprenticeship Commt., supra*, 66 Ohio St.2d at 198, 20 O.O.3d at 203, 421 N.E.2d at 132.

*Hood*, 74 Ohio St.3d at 302.

Plaintiff contends that his disciplinary suspensions in May 2010, January 2011, September 2012, September 2014, and February 2015 constituted unlawful discrimination on the basis of his disability, but the record establishes that Plaintiff cannot set forth a triable claim on this basis.  Initially, because Plaintiff was not diagnosed with a Generalized Anxiety Disorder until July 2014, he cannot establish that the relevant decision makers were aware of his medical condition until at least that time.  Nor can Plaintiff establish that the decision makers involved in any discipline assessed after his diagnosis were aware of his condition.

Assuming *arguendo* that Plaintiff can establish a *prima facie* case regarding the disciplinary actions issued, Defendant has offered legitimate and non-discriminatory reasons for its actions, *i.e.*, that Plaintiff engaged in threatening behavior towards his coworkers and managers, he failed to obtain proper sick leave coverage for an extended absence, and he failed to properly perform his job.  Therefore, any "presumption of discrimination no longer exists," and Plaintiff "must prove that the reasons offered by [Defendant] were in fact pretextual in order to prevail."  *Browning v.Dep't of the Army*, 436 F.3d 692, 695 (6th Cir. 2006).

"[A] plaintiff can show pretext in three interrelated ways:  (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's

(4:15CV0600)

action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To defeat summary judgment, Plaintiff must produce "sufficient evidence from which a jury could reasonably reject" Defendant's explanation for the adverse employment action. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 268 (6th Cir. 2010). In other words, "plaintiff must allege more than a dispute over the facts upon which his [suspensions were] based." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). Moreover, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n. 4.

Plaintiff has not pointed to any facts that show pretext. The Court must view the pretext allegations against the backdrop of the "business judgment" rule, which requires courts to give deference to an employer's decision so long as the employer establishes its reasonable reliance on particularized facts before it at the time the decision was made, even if the decision is later shown to be mistaken or trivial. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-807 (6th Cir 1998). Under these circumstances, Plaintiff should not be permitted to second-guess GM's good faith business judgment as a means of showing pretext. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-709 (6th Cir. 2006) (regarding the honest belief doctrine); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (court does not "act [ ] as a super personnel department, overseeing and second guessing employers' business decisions") (internal quotation marks omitted); *Morris v. Department of Veterans Affairs*, 597 Fed. Appx. 861, 865 (6th Cir. 2015) ("plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally

(4:15CV0600)

[retaliated] against [her]") (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003))

(alteration in original).  Here, the undisputed record reflects Defendant believed, based on its

investigations and numerous complaints by Plaintiff's coworkers and supervisors, that Plaintiff

engaged in misconduct, including at times threatening and intimidating behavior.  In addition,

GM reasonably relied on information provided by its third-party leave administrator that Plaintiff

failed to obtain the proper certification for his leave of absence from June 21, 2014 through July

21, 2014.

By his own admission, Plaintiff does not believe he was treated unfairly as a result of any

discriminatory animus based on his medical condition.  ECF No. 27-2 at PageID #: 307, Page 43.

Rather, he contends his conflict with others in the Lordstown assembly plant stemmed from a

bias toward employees who transferred from out-of-state.  Furthermore, the fact that management

chose not to discipline Plaintiff for many incidents in which other employees complained about

his behavior belies any inference of discrimination.  Finally, Plaintiff cannot credibly suggest

Defendant does not have an interest in preventing threatening and intimidating conduct and

abusive language at its work sites, or that it is somehow inappropriate to discipline employees

who engage in such behavior.  Plaintiff  has not offered any evidence to suggest his disability

played a part in his disciplinary suspensions.

> **2.** **GM's decision in 2011 to condition Plaintiff's return to work on psychiatric evaluation was justified because objective evidence called into question Plaintiff's ability to perform the essential functions of his job.**

Plaintiff argues that Defendant violated state law when it kept him on a medical leave of

absence from January 26, 2011 until October 25, 2011.  However, it was Dr. Warren Rogers,

20

(4:15CV0600)

Plaintiff's own physician—and not GM's—who recommended that Plaintiff remain on an extended leave of absence.  Employers can require an employee to undergo a medical examination, or to make inquiries as to whether an employee has a disability and regarding the nature or severity of the disability, if such examination or inquiry is shown to be "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).  Furthermore, Plaintiff does not dispute and simply ignores the objective evidence to support Defendant's genuine concern about Plaintiff's ability to work with his coworkers and supervisors and the safety of others, making its decision to condition Plaintiff's return to work on psychiatric evaluation both job related and consistent with businesses necessity.

"The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that:  '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.'" *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Denman v. Davey Tree Expert Co.*, 266 Fed. Appx. 377, 379 (6th Cir. 2007)).  "[T]he individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.*

In determining whether an employee's ability to perform his essential job functions is impaired, the employer must point to a "genuine reason to doubt whether that employee can perform job-related functions." *Kroll*, 763 F.3d at 624 (citation and internal quotation marks omitted).  "Such a genuine reason may arise when an employee's 'aberrant behavior' raises the

21

(4:15CV0600)

concern that an employee's mental or emotional instability could undermine [his] ability to complete [his] job functions effectively in the employer's work environment." *Id.* at 624-25. "[A]n employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position." *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013) (finding employer did not violate ADA provision prohibiting medical examinations and inquiries when it required employee who had been placed on leave after making threats against coworkers to undergo a psychiatric/psychological fitness-for-duty evaluation before returning to work). *See also Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir. 2002) (noting in dicta that an employer could have lawfully required medical examination for employee who was hostile, made threats and was insubordinate).

Defendant's request on two occasions in 2011 that Plaintiff seek psychiatric evaluation and treatment before returning to work was permitted because the objective evidence available to the GM physicians showed they had reasonable concerns about Plaintiff's ability to perform the essential functions of his job. Based on legitimate concerns about Plaintiff's mood, insight, and judgment, and the likelihood of Plaintiff threatening or otherwise getting into further conflict with his coworkers or supervisors, in January 2011, Dr. Maryann Olynk referred Plaintiff out for evaluation by a psychiatrist. For these same reasons, and considering Dr. Warren Rogers' conclusion that Plaintiff was only safe to return to work if he took his prescribed medication, in September 2011, Dr. Donald Jones required Plaintiff to undergo further evaluation by Dr. Rogers to ensure Plaintiff was prescribed an appropriate and effective dosage of the medication. Based on the record, Defendant had a genuine concern about Plaintiff's mental state, which affected his

22

(4:15CV0600)

job performance and potentially threatened the safety of his coworkers and supervisors.  Contrary

to Plaintiff's argument, the condition that Plaintiff undergo psychiatric evaluation in 2011 was

not only job related, but also unquestionably "consistent with business necessity," which includes

ensuring that the workplace is safe and secure.

### B.    Harassment

Plaintiff also alleges that GM harassed him on the basis of his disability.  *See* Complaint

(ECF No. 1-1 at PageID #: 9, ¶ 17).  Plaintiff offers no opposition to Defendant's argument that

Plaintiff cannot establish a triable claim of hostile work environment.  *See* Memorandum in

Opposition (ECF No. 34); *see also* Memorandum in Support (ECF No. 26).[10]  Because Plaintiff

failed to meet his burden in opposing summary judgment on his harassment claim, Plaintiff has

abandoned this claim and waived any argument concerning dismissal of such claim.  *Hicks v.*

*Concorde Career Coll.*, 449 Fed.Appx. 484, 487 (6th Cir. 2011) (finding that "[t]he district court

properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address

it in . . . his response to the summary judgment motion"); *see also, e.g.*, *Hadi v. State Farm Ins.*

*Cos.*, 2:07-CV-0060, 2008 WL 4877766, at *13 (S.D. Ohio Nov. 12, 2008) (finding plaintiff's

failure to respond with any evidence supporting his negligent infliction of emotional distress

claim "apparently concedes that summary judgment is proper on this count.").  Therefore,

Defendant's Motion for Summary Judgment (ECF No. 27) with respect to the harassment claim

---

[10]  The pre-filing written exchange required by ¶ 14 of the Case Management Plan (ECF No. 11 at PageID #: 71) should have obviated the need for the Court's attention to be drawn to an unopposed argument.

(4:15CV0600)

is granted for the reasons articulated by Defendant.  *See* Memorandum in Support (ECF No. 27-1) at PageID #: 292-94.

> **C.    Retaliation**

Under Ohio Rev. Code § 4112.02(I), it is "an unlawful discriminatory practice . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section. . . ."[11]  To establish a case of retaliation, a claimant must prove that (1) he engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action.  *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 327 (2007); *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (Rehabilitation Act and ADA case).  "If a complainant establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions."  *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  "If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason for the employment decision.'"  *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

---

[11]   "Federal law provides the applicable analysis for reviewing retaliation claims" in Ohio.  *Baker v. The Buschman Co.*, 127 Ohio App.3d 561, 568 (1998) (quoting *Wright v. Petroleum Helicopters, Inc.*, No. 71168, 1997 WL 578939, at *4 (Ohio App. 8th Dist. Sept. 18, 1997)).

(4:15CV0600)

Plaintiff's claim under the anti-retaliatory provision of § 4112.02(I) (ECF No. 1-1 at PageID #: 9, ¶ 18) fails for two reasons.  First, Plaintiff never engaged in protected activity sufficient to support this claim.  Plaintiff argues that his coworkers' and John Bukavino's alleged acts were in retaliation for his complaints to management about his coworkers shooting rubber bands on the plant floor.  Plaintiff submits that these oral and written requests constitute a most reasonable accommodation request.  ECF No. 34 at PageID #: 438.  Any such argument fails because Plaintiff has offered no evidence that he notified any member of GM management that his complaints about rubber bands were linked or otherwise related to his medical condition.  *See Johnson v. JPMorgan Chase & Co.*, 922 F. Supp.2d 658, 670-71 (S.D. Ohio 2013) (plaintiff could not establish he requested accommodations when he did not provide enough information to his supervisors in making requests for leave to put them on notice of his disability).  Moreover, neither federal nor state law cover the activity for which Plaintiff allegedly suffered retaliation, and therefore Plaintiff's retaliation claim fails as a matter of law.  *See Weaver v. Ohio State Univ.*, 71 F. Supp.2d 789, 793-94 (S.D. Ohio 1998) ("Complaints concerning unfair treatment in general . . . are insufficient to constitute protected activity.").

Second, Plaintiff cannot establish the requisite causal connection exists between his complaints and his coworkers' and Bukavino's alleged retaliatory acts.  To the contrary, Plaintiff attributes his disputes with others in the plant to the fact that he is a loud talker and because he is from out-of-state.  ECF No. 27-2 at PageID #: 307, Page 43; PageID #: 309, Page 50.  Therefore, Plaintiff has not established a triable claim of retaliation.

(4:15CV0600)

> ### D. Plaintiff's claim challenging his production classification and rate of pay is barred by federal labor law.

Defendant argues that any analysis of Plaintiff's claim challenging his production classification and rate of pay requires an interpretation of his rights as set forth in the collective bargaining agreements governing the terms and conditions of his employment, and therefore this state law claim is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  In response, Plaintiff writes:  "Other disputes raised by Defendant inclusive of a section on 'Plaintiff's production classification' are denied for lack of knowledge or hearsay and are nowhere mentioned in Plaintiff's Complaint."  ECF No. 34 at PageID #: 435.  To the extent that Plaintiff challenges his production classification and rate of pay, such claim is "inextricably intertwined" with interpretation of the GM-UAW National Agreement and, thus, is preempted by § 301.  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985).  Even if properly asserted under § 301, any claim for breach of the collective bargaining agreements is subject to the grievance and arbitration remedies set forth in the National Agreement, which Plaintiff admittedly failed to pursue.  *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 657-58 (1965).

## V.  Conclusion

Viewing Plaintiff's probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiff,

Plaintiff's Motion for Summary Judgment (ECF No. 26) is denied; and

(4:15CV0600)

Defendant's Motion for Summary Judgment (ECF No. 27) is granted.


IT IS SO ORDERED.


  May 27, 2016                                    /s/ Benita Y. Pearson
Date                                           Benita Y. Pearson
                                               United States District Judge

27